### In re AMERICAN AIR COMPRESSOR CO.

STOCKS AND STOCKHOLDERS — SETTING ASIDE CONTRACT — CORPORATIONS—CONSIDERATION.

In proceedings to dissolve a manufacturing corporation, which agreed to issue its stock in consideration of an assignment to it of a patent to be obtained and already applied for, its agreement to issue stock for certain patents obtained in other countries, that were to be later exchanged for the American patent, but could not be used in its business, *held*, to be fraudulent, under evidence that the latter agreement was a mere makeshift to secure the issuance of the stock. OSTRANDER, J., dissenting.

Appeal from Wayne; Hosmer, J. Submitted October 3, 1916. (Docket No. 1.) Decided December 21, 1916.

A petition was filed by Henry W. Wolf and others, directors of the American Air Compressor Company,

for the dissolution of the corporation. A subsequent petition for cancellation of a contract to issue stock of the company for certain patents to be transferred to the company was presented by B. J. Sturn, A. J. Wood, and D. H. Barnett. From a decree for petitioners, certain stockholders appeal. Affirmed.

*Emanuel T. Berger,* for petitioners.

*Roy Herald,* for appellants.

KUHN, J. On the 15th of October, 1912, a corporation known as the M. G. M. Manufacturing Company of Detroit, Mich., executed its articles of association for the purpose of manufacturing and selling air compressors. The principal place of business was to be in the city of Detroit and the name of the company was afterwards changed to American Air Compressor Company. The total capital stock was $200,000, divided into 20,000 shares of $10 each and the articles of association were signed by Chas. A. Milne, Douglas McCracken, Beattie Graham, H. Roy Haberkorn, Alfred Johnson, and John S. Affeld, the first three of whom subscribed for $84,500 of the $100,000 of stock subscribed for. The other subscriptions were made up by the transfer of real estate and a machine shop valued at $14,300. On the same day Messrs. Milne, McCracken, and Graham made a contract with this corporation, wherein it was agreed that they would assign to the said corporation the letters patent of the United States government covering a valuable device for compressing air if the same should thereafter be issued in accordance with the application pending in the United States Patent Office, and in consideration of such transfer and assignment of these letters patent, if issued, the corporation was to issue to the first parties stock as follows: To Milne, 2,334 shares; to McCracken, 2,333 shares; and to Graham, 2,333 shares; and 2,000 shares would also be issued jointly

to Milne and Graham to pay promotion expenses. The application was denied, and no letters patent from the United States government were ever issued for this air compressor. Letters patent had been issued to the three men before mentioned by the governments of Great Britain, Italy, France, Dominion of Canada, and Germany. In March, 1913, a second contract was entered into by the aforesaid men and the American Air Compressor Company, whereby they turned over to the company the letters patent received from the foreign governments above mentioned in lieu of the United States patent, and the stock as above enumerated was issued to them upon the transfer of these foreign patents. This contract also contained an agreement that as soon as the letters patent of the United States government were issued upon the application then pending, or upon any other later application for improvements thereon, said parties would cause said letters patent so issued to be transferred to said company, and that they would have returned to them the foreign patents. This agreement was ratified by the board of directors. Milne, the inventor, continued to experiment with the device, but no perfect machine was ever produced for commercial purposes. In March, 1914, the five directors of the company filed a petition to dissolve the corporation, alleging that it had not been able to manufacture and sell the machine for which it had been organized, and that the business had been run at a loss. It was shown that the company was still solvent, and on October 30th a decree of dissolution was entered and an order made appointing the Union Trust Company statutory receiver. The receiver realized $30,000 from the sale of the physical assets of the company, and has now in its hands, after payment of all debts, the sum of $11,000 to cover the expenses of receivership and for distribution among the stockholders.

On July 28, 1914, a petition was filed by certain stockholders, praying for the cancellation and rescission of the last-mentioned contract entered into by Milne, McCracken, and Graham with the company. On October 26, 1914, a decree was entered, granting the relief prayed for, rescinding and canceling said contract and the shares of capital stock of said corporation owned by the appellants. This decree is appealed from, and it is urged that, in considering the action of the board of directors in purchasing the foreign patents in lieu of the United States patent, and issuing the stock of the company therefor, honesty and fair dealing must be presumed, and that in the absence of proof of actual fraud, bad faith, misrepresentation, or recklessness, the courts should not interfere.

Thus broadly stated as a general proposition it is unquestionably sound, but in the consideration of this case we must take the facts as we find them in the record. The whole question here turns upon the action of the promoters and the board of directors in substituting the foreign patents when the patent of the United States upon the article in question had been agreed upon. The agreement itself by its terms shows clearly that the transfer of the foreign patents was merely a makeshift in order to secure for Milne, McCracken, and Graham their stock, for which they were to pay by the transfer to the company of the United States patent. Indeed it is clear that there was no intention that the foreign patents were to be complete satisfaction for the purchase price of said stock. This appears from the resolution of the board of directors, which authorized the execution of the said contract. It is as follows:

"Thereupon a motion was made by George A. Sturges and seconded by Alfred Johnson, that the executive board be given power to act on the purchasing of the foreign patents until the United States patents were issued, at which time the said foreign patents

should be returned to their previous owners and the American patents received in lieu thereof."

The learned circuit judge who heard the proofs said, with reference to this transaction:

"Now, from what appears upon the record of the directors of this corporation it seems to be clear that the evident intent of the parties is set forth in this agreement itself, and I cannot think otherwise than as I said earlier in the hearing of this matter that this is but a device to beat the devil around the stump to permit the issuance of this corporate stock prior to the time of the delivery of the letters patent."

The corporation was organized to do business in Detroit, Mich., to manufacture air compressors and one of its objects was to acquire the United States patent when issued. For this the original agreement provided that $90,000 worth of stock was to be paid. This United States patent was never obtained, and the company was never commercially on its feet. It also appears conclusively from the record that no one seriously proposed to make use of the foreign patents at this stage of the development of the company. The substitution of the foreign patents for the patent of the United States so as to permit of the issuing of the stock operated, in our opinion, as a fraud upon the rest of the stockholders, and therefore the decree of the lower court in setting aside and canceling the contract permitting it is affirmed, with costs to the appellees.

STONE, C. J., and BIRD, MOORE, STEERE, and BROOKE, JJ., concurred with KUHN, J.

OSTRANDER, J. In my opinion the court should leave these stockholders and their contracts in this proceeding where they left themselves.

PERSON, J., did not sit.